# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
December 8, 2009 Session

## HENRY ZILLON FELTS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Sumner County**
**No. 879-2007     Dee David Gay, Judge**

---

**No. M2009-00639-CCA-R3-PC - Filed April 5, 2010**

---

Following a jury trial, the Petitioner, Henry Zillon Felts, was convicted of attempted first degree murder and aggravated burglary. He was sentenced to twenty-one years in the Department of Correction. This Court affirmed his convictions and sentences. See State v. Henry Zillon Felts, No. M2005-01215-CCA-R3-CD, 2006 WL 2563374 (Tenn. Crim. App., Nashville, Aug. 25, 2006). He subsequently petitioned for post-conviction relief. The Criminal Court of Sumner County found that the Petitioner received the ineffective assistance of counsel at trial because: (1) trial counsel failed to fulfill his promise to the jury that the Petitioner would testify; and (2) trial counsel failed to argue attempted voluntary manslaughter as a defense. The post-conviction court thus set aside the Petitioner's convictions and granted him a new trial. In this appeal, the State contends that the post-conviction court erred in granting the Petitioner relief. After our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Robert E. Cooper, Attorney General and Reporter; David H. Findley, Senior Counsel; Lawrence R. Whitley, District Attorney General; and C. Ronald Blanton, Assistant District Attorney General, for the appellant, State of Tennessee.

Gregory D. Smith, Clarksville, Tennessee, for the appellee, Henry Zillon Felts.

# OPINION

## Factual Background

On direct appeal, this Court summarized the facts underlying the Petitioner's case as follows:

> In this case, the [Petitioner] was accused of aggravated burglary of his ex-wife's home for entering without her authority and with a loaded gun. The [Petitioner] then shot a guest in the home four times and, consequently, was charged with attempted first degree murder.
>
> Kent Miller, the victim herein, testified that he first met Pam Felts, the [Petitioner]'s ex-wife, at a basketball game. Miller's and Ms. Felts' relationship gradually grew into casual dating which usually involved their children being present. Miller stated that he and Pam Felts only had one date alone, a brief outing to hit golf balls. Shortly after Valentines Day of 2003, Miller had delivered a Valentine basket to Ms. Felts' residence when the [Petitioner] appeared outside. The [Petitioner] shouted questions from outside the house such as "who is it?" or "what is he doing there?" No confrontation occurred as a result of this encounter. The [Petitioner] began to call the victim's home and cell phone numbers about three weeks prior to May 5. According to the victim, the [Petitioner] told him to stay away from Ms. Felts and made threats. On April 28, the [Petitioner] left a message on the victim's cell phone saying, "Mf, you have f-ked up."
>
> On May 4, the victim and Ms. Felts devised a plan to leave the victim's truck at her house overnight. The avowed purpose was to show the [Petitioner] that Ms. Felts was "getting on with her life." On May 5, Ms. Felts brought the victim back to retrieve his truck. The victim learned that the [Petitioner] had been at Ms. Felts' house that morning and was very upset. The victim and Ms. Felts went into her kitchen. The victim heard a banging on the door and saw the [Petitioner] outside with a gun. The [Petitioner] then entered the house. The victim told Ms. Felts to call the police. The [Petitioner] pushed Ms. Felts aside and came toward the victim. The victim went into the living room and armed himself with a bat. When the [Petitioner] entered the room, the victim swung the bat once and hit the [Petitioner] in the head. The blow knocked the [Petitioner] back, and the victim heard gunfire. The victim swung again at the [Petitioner]'s knees, then said he became dazed and heard more gunshots. The victim remembered hearing three shots but was

actually shot four times. The victim fell to the floor and was unable to get up. The victim's last memory was of a paramedic speaking before the victim lapsed into a coma for three and one-half weeks. The victim acknowledged that the statement he gave to Detective Witherow during his convalescence varied somewhat from his testimony. The victim attributed the earlier variances to being "kind of in a fog."

On cross-examination, the victim stated he was aware that the [Petitioner] had lived with Ms. Felts during the latter part of 2002. He said that Ms. Felts had changed the locks to her house in January of 2003. The victim admitted telling Detective Witherow that he had placed the bat in the living room "just in case." The victim also told Detective Witherow that he had driven to Ms. Felts' house on May 5. The victim said he was unaware that Ms. Felts had scheduled a meeting with the [Petitioner] at 1:00 p.m. on May 5, 2003. The victim stated he may have told Ms. Felts that he could "take" the [Petitioner] in a fist fight.

Dean Hall was a paramedic who responded to Ms. Felts' house on May 5. He testified that he found the victim laying face up on the floor, pale in complexion, and with rapid breathing. The victim answered questions appropriately.

Shannon Helmig, an emergency medical technician, was also on the responding team. Ms. Helmig first went to the [Petitioner] and assessed his condition. The [Petitioner] told Ms. Helmig that he had shot a man who had hit him in the head with a baseball bat. After satisfying herself that the [Petitioner] was not in critical condition, she went to the victim. She stated that she observed the gunshot wounds of the victim, two in the chest, one in the groin area, and one in the left leg. She saw two exit wounds. Ms. Helmig said that, based on her experience, all the shots were fired from close range.

Penny Ross, a paramedic, tended to the [Petitioner]. She said he had a laceration over one eye, which was swollen and bleeding. The [Petitioner]'s left knee had a contusion. She described the [Petitioner]'s condition as "very much alert" and aware that he had shot someone and that he had been hit with a baseball bat.

Randy Tope, a Hendersonville policeman, was one of the responding officers. He saw the [Petitioner] sitting on the lawn of a residence. Officer Tope also saw a gun at another location on the lawn. He stated that he stayed

with Ms. Felts until 3:30 p.m. During that time, he took a statement from Ms. Felts.

Pam Felts testified that she and the [Petitioner] had been divorced since late 1999 or early 2000. She characterized their relationship as being "a roller coaster ride." During the periods that Ms. Felts was seeing the [Petitioner], he stayed with her some nights and also maintained his residence in Mt. Juliet. The [Petitioner] paid Ms. Felts $500 per month for rent. The parties lived separately from September to December of 2002, but then resumed their relationship. In February of 2003, the [Petitioner] had Ms. Felts arrested for domestic assault. Ms. Felts then changed the locks at her residence and did not furnish the [Petitioner] with a key. The [Petitioner], however, still stayed with Ms. Felts on some nights and continued paying her. Ms. Felts said the [Petitioner] was sometimes "intimidating" to her when he would "scream, curse, and stomp his feet." The [Petitioner] did not approve of Ms. Felts associating with the victim. She stated that the [Petitioner] had warned the victim to "get out of the middle of our relationship" and also told the victim, "I'm going to kick your ass."

On May 2, Ms. Felts placed the [Petitioner]'s possessions on her porch during his absence. On May 4, she and the victim agreed to leave the victim's vehicle at Ms. Felts' house overnight although the victim did not stay there. Ms. Felts said this was intended as a signal to the [Petitioner] that she had begun a "dating, romantic type situation." Ms. Felts also called the [Petitioner] to ensure that he saw the victim's vehicle parked at her residence.

The [Petitioner] came to Ms. Felts' residence early on May 5. He placed calls to her which were at first ignored. Ms. Felts eventually answered the [Petitioner] and arranged to meet with him at 1:00 p.m. that day. The [Petitioner] then left. Ms. Felts transported the victim back to her house to retrieve his vehicle. While the victim and Ms. Felts were in her kitchen, the [Petitioner] returned and called on the phone. Ms. Felts stated that she handed the victim the telephone but did not know what the [Petitioner] said. She recalled that the victim laughed. The [Petitioner] entered the house by using a key. Ms. Felts denied ever having given the [Petitioner] a key since the locks were changed. The [Petitioner] came in quickly, holding a handgun. Ms. Felts heard the victim say, "Call the police." She also thought the [Petitioner] said, "Where is he?" She followed the [Petitioner] and saw the victim hit the [Petitioner] with a bat three times. The [Petitioner] and victim went out of Ms. Felts' view, and she heard a gun shot. She then ran into the garage and hid.

-4-

She stated she heard four or five shots. While Ms. Felts was talking to the 9-1-1 operator, she saw the [Petitioner] in her neighbor's lawn. She stated that he was staggering and dropped the gun before sitting on the neighbor's door steps.

On cross-examination, Ms. Felts said her impression was that the [Petitioner] had the gun to get attention but not to shoot anyone. She affirmed that the [Petitioner] always paid her on the fifth of each month. She said she had never given the [Petitioner] a notice to vacate other than placing his possessions outside. Ms. Felts also stated that the victim could have left the house when the [Petitioner] entered as there was no need to protect her.

Detective Jim Vaughn, of the Hendersonville Police Department, stated that he took possession of the [Petitioner]'s gun. He identified it as a Bryco Arms, 9-mm semiautomatic pistol. The gun was jammed when Detective Vaughn found it. Detective Vaughn found the [Petitioner]'s keys just inside the door of Ms. Felts' residence. One key fit the door lock that the [Petitioner] entered. Six empty casings were found in the house and one casing was in the pistol, indicating that seven shots were fired. Detective Vaughn stated that rolling papers and a substance appearing to be marijuana were recovered from the [Petitioner]'s truck.

Sergeant James Lawson of the Hendersonville Police Department, testified that he responded to the shooting scene and supervised securing the area. The [Petitioner] told Sergeant Lawson that he had been staying with his ex-wife, that a man assaulted him with a bat, and that the [Petitioner] shot him.

Mrs. Barbara Harrison stated that she lived directly across the street from Ms. Felts. On May 5, she had seen the [Petitioner] arrive at Ms. Felts' house at approximately 9:00 a.m. The [Petitioner] appeared agitated and was knocking on Ms. Felts' front and back doors. The [Petitioner] left and returned later in the day. The [Petitioner] repeated his actions of knocking on Ms. Felts' doors and then sat in his truck a short time. The [Petitioner] then entered the back door of the residence. Later, Mrs. Harrison saw the [Petitioner] coming out of Ms. Felts' house holding his hands up with the appearance that "something was very wrong." She saw the [Petitioner] walk out of sight, then return to her lawn. Other neighbors went to the [Petitioner], then the police and other emergency responders arrived.

Mr. Geoffrey Brown stated that he lived in the neighborhood of Ms. Felts. While walking outside on May 5, he heard someone groaning in pain. Upon investigating, Mr. Brown saw the [Petitioner], who was bleeding and in distress. Mr. Brown questioned the [Petitioner] on what happened to him. The [Petitioner] told him that he could not stand his ex-wife being in the house with another man. The [Petitioner] pointed out to Mr. Brown where the gun lay at the street corner.

Ryan Brown, the son of Geoffrey Brown, testified that he also saw the [Petitioner] on May 5. The [Petitioner] told Ryan Brown, "I couldn't stand him being in there with her. I shot him five or six times." On cross-examination, Ryan Brown said the [Petitioner] also told him that the man had hit him with a baseball bat.

Detective Dirk Witherow was the lead investigator in this case. He visited the [Petitioner] at Vanderbilt Hospital to take photographs and to perform a gunshot residue test. The [Petitioner] refused to make a formal statement but volunteered that he did not mean to shoot the victim, but the victim "came at him with a bat."

On cross-examination, Detective Witherow said the victim had told him that he only hit the [Petitioner] once with the bat. Detective Witherow stated that he knew the [Petitioner] was hit more than once.

The State then rested. The [Petitioner] produced one witness, the [Petitioner]'s daughter who was not present during the incident. After voir dire, the [Petitioner] chose not to testify and the defense concluded.

State v. Henry Zillon Felts, No. M2005-01215-CCA-R3-CD, 2006 WL 2563374, at *1-4 (Tenn. Crim. App., Nashville, Aug. 25, 2006). The Petitioner was convicted of attempted first degree murder and aggravated burglary. The Petitioner filed a petition for post-conviction relief on September 24, 2007. Three amendments followed, on November 9 and December 17, 2007, and on October 14, 2008.

The Petitioner's post-conviction hearing was held on January 27 and 28, 2009. At the hearing, he abandoned most of the grounds for post-conviction relief contained in his petition, focusing instead on his claims that he was denied the effective assistance of counsel because his trial counsel failed to argue attempted voluntary manslaughter as a defense and failed to fulfill his promise to the jury that the Petitioner would testify.

David Raybin testified on the Petitioner's behalf. He noted that he received his juris doctorate from the University of Tennessee College of Law, and received his license to practice law in Tennessee in 1974. He served as an Assistant Attorney General for three-and-one-half years and as an assistant district attorney for seven years before taking a year off to write the criminal law section of the West Tennessee Practice Series. In 1985, he entered private practice as a criminal defense attorney, doing both criminal trial and appellate work. Mr. Raybin testified that, in addition to serving on numerous commissions and giving multiple Continuing Legal Education lectures, he has written many law review and journal articles and has served as the attorney of record in over one hundred appellate cases. Before qualifying Mr. Raybin as an expert in criminal law, the post-conviction court agreed that he is "one of the best known and best respected criminal defense attorneys in the state of Tennessee."

As to his process for evaluating the Petitioner's claims of ineffective assistance of counsel, Mr. Raybin testified that he met with the Petitioner, interviewed the Petitioner's trial attorneys, and reviewed the Petitioner's case file as compiled by John Philips ("trial counsel"), the Petitioner's lead trial attorney. He also read transcripts of the Petitioner's trial, sentencing hearing, and hearing on his motion for a new trial.

Mr. Raybin explained the doctrine of attempted voluntary manslaughter, noting its status as a defense, the viability of which should be analyzed when a person is charged with attempted first or second degree murder. He also explained the legal standards for ineffective assistance of counsel under both Tennessee and Federal law, noting that some practitioners believe Tennessee's standard to be slightly easier for a Petitioner to satisfy. Mr. Raybin discussed recent case law that he believed eliminated any practical difference between the two standards, however, and accordingly explained that he evaluated the merits of the Petitioner's claim using the Federal standard.

Mr. Raybin first discussed trial counsel's failure to raise attempted voluntary manslaughter as a defense. Applying the Strickland standard to the [Petitioner]'s case, Mr. Raybin concluded that Mr. Phillips' investigation and organization "fell well within the standard of conduct demanded of attorneys in criminal cases." Mr. Raybin noted that the list of defenses Mr. Phillips considered, as recorded in the Petitioner's file, included only duress, self defense, protection of life or health, and use of deadly force by a private citizen. He found no evidence that trial counsel considered attempted voluntary manslaughter as a defense, noting that it did not appear in the file and that trial counsel did not argue it at any point during trial. Mr. Raybin opined that the failure to raise attempted voluntary manslaughter as a defense in a case like the Petitioner's constituted deficient performance. Mr. Raybin also opined, based on his experience, that there was more than a reasonable probability that the jury would have convicted the Petitioner of attempted voluntary

manslaughter had it been argued. Mr. Raybin also noted that there was no tactical reason not to raise attempted voluntary manslaughter as a defense, and that the Petitioner's file contained no evidence that trial counsel discussed his abandonment of that defense with the Petitioner.

Mr. Raybin next discussed trial counsel's failure to fulfill his promise to the jury that the Petitioner would testify. The post-conviction court first noted that the State, the trial court, and trial counsel all stated in the jury's presence that the Petitioner would testify. Mr. Raybin noted that, in his experience, juries resent a party that fails to fulfill a promise. He also noted that there were no "land mine issues" that would explain trial counsel's decision to advise against the Petitioner testifying, as the State has successfully established the bad relationship between the Petitioner and Ms. Felts. Mr. Raybin opined that, in this case, the jury needed to hear the Petitioner say that he intended to have a confrontation with the victim but did not intend to shoot him. He also noted generally the importance of having a [Petitioner] explain his or her self-defense rationale to a jury, although he said that self-defense was an imperfect defense in this case because the Petitioner precipitated the conflict with the victim. He also believed that the Petitioner's testimony was necessary to make a case for attempted voluntary manslaughter. Mr. Raybin opined that trial counsel's failure to call the Petitioner as a witness constituted deficient performance. He also opined that there was a reasonable probability that the Petitioner's failure to testify prejudiced him, as the defense presented little to no evidence corroborating the Petitioner's claim that he acted in self-defense or presenting his version of the events underlying the charges against him.

On cross-examination, Mr. Raybin noted that everything in the Petitioner's file indicated that trial counsel was preparing him to testify. He also admitted that attempted voluntary manslaughter appeared in the jury instructions at trial. He again noted that self-defense was an imperfect defense for the Petitioner because the Petitioner precipitated the confrontation with the victim. Mr. Raybin believed attempted voluntary manslaughter was entirely viable, however, because from the Petitioner's perspective there had been no clear rescission of the relationship between him and Ms. Felts; the provocation element of attempted voluntary manslaughter was therefore still in play.

Mr. Raybin also noted that in some cases there may be a good reason that a [Petitioner] is not called to testify after such testimony has been promised. Such a decision must be reasonable, however, and Mr. Raybin could find no justification in the Petitioner's file. Finally, Mr. Raybin noted that he had reviewed post-conviction petitioners' cases about fifty times in his career and, in all but six, declined to testify, for lack of merit.

The State called trial counsel as a witness, who noted that he worked on the Petitioner's trial with the Petitioner's regular lawyer, Scott Parsley, and an associate named

Bart Highers. Mr. Parsley referred the Petitioner to trial counsel. Trial counsel noted that he gave the Petitioner's entire file to Randy Lucas, the Petitioner's original post-conviction attorney, and thus, had been unable to refresh his recollection before testifying. He had read the Petitioner's petition for post-conviction relief and its amendments.

Trial counsel testified that he met with Mr. Parsley and the Petitioner a number of times, and that he spent a significant amount of time rehearsing the Petitioner's trial testimony. He could not recall discussing potential defenses with the Petitioner. He said he chose to recommend against the Petitioner testifying because the Petitioner had grown increasingly nervous and anxious as the trial progressed; trial counsel doubted that the Petitioner could answer questions effectively. He also believed that there were "certain basic contradictions in either things [the Petitioner] had said or done that were going to be very difficult to deal with." He was also concerned that putting the Petitioner on the stand would give the State an opportunity to play the messages the Petitioner had left on Ms. Felts' answering machine; he admitted, however, that the jury had already heard all of the messages at least once during the State's case-in-chief. Trial counsel also believed that Ms. Felts testified in a way that was sympathetic to the Petitioner. Trial counsel could not recall why he did not raise attempted voluntary manslaughter as a defense, but believed he had represented the Petitioner to the best of his ability. The State read into the record the hearing in which the Petitioner affirmed that he had made the ultimate decision not to testify.

On cross-examination, trial counsel said he had tried eight to fifteen criminal cases in his career. He had not tried a criminal case in the four-and-one-half years since the Petitioner's trial. He also clarified that the Petitioner's decision not to testify was made on trial counsel's recommendation, as well as that of Mr. Highers and Mr. Parsley: "At that point of the trial all the attorneys felt that [the Petitioner] could not effectively testify." Trial counsel did not specifically remember promising the jury that the Petitioner would testify, but did not doubt the accuracy of the trial record.

The Petitioner also testified. He said that trial counsel spent two days preparing him to testify at trial. During that time, however, trial counsel only asked the Petitioner one actual practice question; he did not like how the Petitioner answered the question, and Mr. Parsley said he would confuse the jury. Trial counsel told the Petitioner that he, rather than the Petitioner, would ultimately decide whether the Petitioner would testify. The Petitioner recalled that trial counsel had planned to have him testify if he thought they were losing the trial, and had planned not to have him testify if he thought they were winning.

Either immediately before or after lunch on the second day of trial, trial counsel told the Petitioner he would not testify. He did explain his reasons at the time. The Petitioner remembered the hearing in which he was questioned about the decision not to testify, but said

he did not understand that he alone could choose whether to testify. He denied that the trial judge ever told him the ultimate decision was his.

Before trial, trial counsel sent the Petitioner a piece of paper listing his charges and their lesser-included offenses. He did not remember any discussion of attempted voluntary manslaughter as a defense. The Petitioner noted that he graduated high school but did not attend college, and that he had been convicted of some misdemeanors but no felonies.

As an offer of proof, the Petitioner described at length his relationship with Ms. Felts and the events leading up to and surrounding his confrontation with the victim. He said he married Ms. Felts in 1997; they divorced in 2001. Their relationship continued, however; the Petitioner believed that they were sexually addicted to each other. They continued to see each other on and off until October 2002, at which time they broke up. Around Christmas that year, however, Ms. Felts paged the Petitioner. He called her, and she told him she wanted to see him but that she had met a man with whom she had "been talking." The man was the victim. Ms. Felts told the Petitioner that the victim planned to come over to her house that evening, but that she would have him leave before 10:00 p.m.

The Petitioner arrived at Ms. Felts' house around that time. Seeing what he assumed to be the victim's car still in the driveway, he called Ms. Felts on his cellular telephone. She said she would ask the victim to leave. The Petitioner then drove around the block a few times. Wanting the victim to see him, the Petitioner pulled into Ms. Felts' driveway just as the victim backed out. He went inside. He and Ms. Felts had sex, and their relationship resumed. Ms. Felts was sexually flirtatious with the Petitioner, and she regularly sent him coded text messages of a sexual nature.

Shortly thereafter, Ms. Felts told the Petitioner that she wanted to go to school, but could not do so and continue to work. She proposed that he give her $500 per month in rent since he stayed at her house so frequently. He agreed, and she gave him a key to the house. They also agreed that they would have an exclusive relationship including sexual relations. The rent was due between the first and fifth of every month, and the Petitioner always paid on time. Ms. Felts told the Petitioner that she had already informed the victim that she and the Petitioner were trying to work things out.

Sometime during the week of January 20, 2003, the Petitioner and the victim got into an argument. During the argument, Ms. Felts took the Petitioner's key to her house. She also pointed a gun at him. The Petitioner called the police and had Ms. Felts arrested. They reconciled shortly thereafter. The Petitioner procured another house key about a month later, while still staying at Ms. Felts' house and continuing to pay rent.

-10-

Their relationship continued undisturbed, but for occasional interference by the victim, until the Friday night about two weeks before the Monday, May 5 shooting at issue in this case. Around that time, Ms. Felts demanded that the Petitioner shave his armpit hair in order to prove his love for her. The Petitioner refused. Ms. Felts responded that the victim would like to take the Petitioner's place, and that he had offered her money. The Petitioner was angry. He stayed at Ms. Felts' house that night, but the argument resumed in the morning. The Petitioner agreed to leave, but told Ms. Felts he had a right to stay because he was paying rent.

The Petitioner stayed at his residence for the rest of the weekend. Ms. Felts called him on Monday morning, angry because she believed that he was responsible for the police coming by her house to check on her well-being. He told her he had not called the police. After some investigation, Ms. Felts and the Petitioner determined that the victim had called the police after calling Ms. Felts' phone a few times and receiving no answer. The Petitioner then called the victim's phone and left the message, "mf, you've effed up."

That night, Ms. Felts called the Petitioner and asked him to come over. The Petitioner did so. Ms. Felts told the Petitioner that she was only friends with the victim, that she had never kissed him, and that she wanted to be with the Petitioner for the rest of her life. They had sex, and the Petitioner stayed the night.

Their relationship was peaceful until the morning of Friday, May 2, at which time Ms. Felts became angry at the Petitioner for cheating on her, which he testified he had not done. That evening, the Petitioner left Ms. Felts' house to go to the store; when he returned, he saw that Ms. Felts had removed his possessions from her house and put them on a chair on the porch. He retrieved his possessions and returned to his home.

The next morning, the Petitioner drove back to Ms. Felts' house. Upon arriving, he saw the victim walking to his car, which was parked in the driveway. Ms. Felts stood at the house's side door. The Petitioner became very angry and kept driving. He called Ms. Felts, who said that the victim had not spent the night, but had merely stopped by to give her an exercise tape. Ms. Felts added that the Petitioner was "chickenshit" for failing to stop at her house in the victim's presence, and she said that the Petitioner did not love her. The Petitioner responded, "well, let me catch him there again and see if I don't stop."

The Petitioner went to work. While there, he called the victim and told him, "stay out of our business." The conversation otherwise included a substantial amount of yelling and the liberal use of profanity by both parties. The victim said that Ms. Felts was pursuing him, and suggested that both he and the Petitioner leave her alone. The Petitioner responded that only the victim should leave her alone and said that "you can go to hell." The victim said

-11-

"don't underestimate your enemies," and hung up. The Petitioner noted that Ms. Felts frequently used the victim's presence in her life to annoy him. Once, she had claimed to be speaking to the victim on the phone; the Petitioner checked the phone's caller identification, however, and discovered that she had been speaking to someone else.

Sometime after the Petitioner's conversation with the victim, Ms. Felts called and she was very angry. She said that she would not allow the Petitioner to prevent her from seeing other people. She said, "I don't know what I'm going to do, but I'm going to fuck you up." Ms. Felts again accused the Petitioner of cheating on her, and explained that she was punishing him even though she continued to love him.

The Petitioner drove to Ms. Felts' house the morning of Sunday, May 4, in order to ascertain the presence of any unwanted car in the driveway. Seeing no such car, he called Ms. Felts, who explained that the absence of the victim's car did not necessarily mean the victim had not been at her house. They argued. At about 10:30 p.m., Ms. Felts called the Petitioner. He was tired, so he did not answer.

When he woke up on Monday, May 5, the Petitioner checked his voice mail. Ms. Felts had left a message in which she said, "I'm about to do what you need to let go. I'm about to give it what it'll take to break up." The Petitioner understood from this message that Ms. Felts intended to have sex with the victim. The Petitioner "broke down" emotionally, incredulous that his relationship with Ms. Felts had fallen apart just when he believed they had resolved the issues that led to their divorce and continuing discord.

The Petitioner called Ms. Felts a few times but kept getting her voice mail. He left a message stating that he was driving to her house to talk. As the Petitioner turned onto Ms. Felts' street, he saw the victim's vehicle in her driveway. He was devastated. He parked his car and knocked on Ms. Felts' front door. Her son, Dillon, answered. The Petitioner told Dillon to get Ms. Felts; he then left, however, because he did not want to argue in front of Dillon. He called Ms. Felts again. She answered and said she had turned the ringer off and did not know he had been calling. The Petitioner assumed this meant she had been having sex with the victim.

The Petitioner parked his car nearby in a place that afforded a view of the street in front of Ms. Felts' house. When he saw Dillon board a school bus, he returned to the house. He made some noise outside of the house; Ms. Felts called his cell and asked him to leave. He said he would leave if she would agree to talk to him on the phone.

He returned to his home and called Ms. Felts. Their "same old argument" ensued. The Petitioner was angry and told Ms. Felts that she was breaking her promise to be truthful

with him. He told her that he was going to drive back to her house and instructed her to make sure the victim was gone when he arrived so they could talk.

Having returned to Ms. Felts' house, the Petitioner knocked on the side door. No one answered. He tried to call Ms. Felts but received no answer. As he knocked on the front door, he saw Ms. Felts "coming from the bedroom area with her silky pajamas on." She refused to let the Petitioner in. The Petitioner then saw her walk to the kitchen; he stood outside the kitchen window and watched Ms. Felts cook bacon and eggs. She then returned to the bedroom.

A few minutes later, the Petitioner succeeded in getting Ms. Felts on the phone. She "started talking to [him] kind of sexually," asking the Petitioner whether he enjoyed watching her in her pajamas. The Petitioner said he just wanted to talk. Ms. Felts said that she would talk to him if he came back at 1:00 p.m.

The Petitioner left and waited until 1:00 p.m. He began to drive back to Ms. Felts' house. At that time, it occurred to the Petitioner that Ms. Felts had only made breakfast for one, and that he had not seen or heard the victim at Ms. Felts' house when he had returned after Dillon went to school. He concluded that Ms. Felts was "messing with" him. He called Ms. Felts and told her he did not think the victim was with her; she gave the victim the phone, at which point he laughed and said, "I'm here, what are you going to do?" The victim handed the phone back to Ms. Felts; the Petitioner told her he was on his way. He asked, "if I come in there, will it prove that I love you?" Ms. Felts responded that the Petitioner was "not going to do anything. You don't really care about me."

The Petitioner testified that he believed he had to go to Ms. Felts' house to avoid losing her, but that he took his gun, which he stored in his car's glove box, because he was scared. He knew that the victim had already told Ms. Felts that he could "take [the Petitioner] easily," and the Petitioner thought the gun would prevent a fight from occurring. He put the gun in one of the front pockets of his pants.

The Petitioner approached Ms. Felts' house. He could see the victim standing behind Ms. Felts in the kitchen. The Petitioner called Ms. Felts and took his key to her house out of his pocket. Over the phone, he heard Ms. Felts say, "he's got a gun in his pocket."

The Petitioner opened the front door of the house and entered. He dropped his key on the ground; after taking a few steps inside, he heard the victim say, "do it." He went up the set of about three steps that separated the foyer from the next room; noticing that the victim had disappeared, he took his gun out of his pocket and entered the kitchen. Concerned about the victim coming in through the kitchen entrance behind him, the Petitioner crossed

the kitchen and exited. At that moment, he was hit hard over his left eye by a baseball bat. Stunned, he felt another hard impact to his left knee. He then felt a number of weaker impacts in quicker succession.

The Petitioner then felt the victim run at him and push him from the front. Thinking that the victim intended to kill him, the Petitioner raised his gun and fired. The Petitioner's next memory was of standing up and seeing the victim on his back in a fetal position. Realizing he had shot the victim, the Petitioner exited the house through its side door, put his hands in the air, and yelled for someone to call an ambulance. He appears to have discarded his gun around this time. The Petitioner wandered among a small crowd that had gathered, finally settling on a neighbor's steps. He became hysterical and began rocking back and forth. He heard Ms. Felts asking him if he had been shot. The Petitioner could not see very well because he had blood in his eyes and did not have his glasses. He perceived one or two people coming toward him, however, and told them what happened. When emergency medical personnel arrived, the Petitioner directed them to help the victim first.

Explaining his actions, the Petitioner again noted that he loved Ms. Felts and that he believed he had to make a stand and fix their relationship or lose her forever. He also noted that his mother had suffered a stroke a few days before the shooting. He said this information had not come out at trial. He believed he could have conveyed his testimony at trial just as competently as he had at the post-conviction hearing.

In an order dated March 5, 2009, the post-conviction court granted the Petitioner's petition for post-conviction relief on both of the grounds argued at his hearing. The State now appeals that grant.

**Analysis**

The State contends that the post-conviction court erred in granting the Petitioner post-conviction relief. To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal [Petitioner] the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the [Petitioner]'s lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. To demonstrate prejudice, a [Petitioner] must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The [Petitioner] bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The [Petitioner]'s failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

-15-

In its order granting post-conviction relief, the post-conviction court credited the expert testimony of David Raybin as to the standard of reasonably effective assistance in Tennessee, as well as the facts underlying Mr. Raybin's conclusion that trial counsel failed to meet this standard in this case, which prejudiced the Petitioner. The post-conviction court also found the Petitioner to be a good witness able to clearly articulate his version of the events underlying this case. Specifically, the post-conviction court found the Petitioner's testimony to be "extremely compelling" on two issues: (1) trial counsel failing to seek an attempted voluntary manslaughter conviction; and (2) trial counsel promising the jury that the Petitioner would testify and then failing to carry out that promise. Having reviewed the post-conviction hearing transcript, trial transcript, trial counsel's file, and the parties' briefs, we cannot conclude that the evidence preponderates against the post-conviction court's findings of fact. We particularly note that: (1) the Petitioner appeared to have had little difficulty testifying; (2) trial counsel's file reflects no consideration of attempted voluntary manslaughter as a defense; and (3) the Petitioner, the State, and the trial court all mentioned in the jury's presence that the Petitioner planned to testify. We now review de novo the post-conviction court's application of its factual findings to the issues of deficiency and prejudice. See Fields, 40 S.W.3d at 458.

## I. Deficiency
### A. Petitioner's Failure to Testify

Trial counsel's failure to call the Petitioner to testify actually involves two issues of potentially deficient performance: the failure to present the Petitioner's version of events, and the failure to keep a promise made to the jury that the Petitioner would testify. In holding that trial counsel was deficient on the former, the post-conviction court cited State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991):

[F]actors which would tend to indicate ineffective assistance [when a [Petitioner] is not called to testify are]:

(1) only the victim and the [Petitioner] were present when the offense was committed;

(2) only the [Petitioner] could present a "full version of her theory of the facts";

(3) the [Petitioner]'s testimony could not be impeached by prior criminal convictions;

(4) the [Petitioner] could give an account of the relationship with the victim; and

-16-

(5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the [Petitioner].

Id. at 227 (citing State v. Dorothy Renate Gfeller, No. 87-59-III, 1987 WL 14328, at *5 (Tenn. Crim. App., Nashville, July 24, 1987)). The post-conviction court concluded that, "as in Zimmerman," where post-conviction relief was granted on this ground, "the first four are applicable here." See id. at 228.

We agree, although we note that Ms. Felts was present for the events immediately preceding the Petitioner's conflict with the victim and played some part in those events; for instance, she warned the victim that the Petitioner had a gun in his pocket. Nevertheless, we conclude, based on Zimmerman, that trial counsel's failure to call the Petitioner to testify as promised constituted deficient performance, especially noting his competently delivered, credible testimony at his post-conviction hearing. The record and the post-conviction court's findings demonstrate that trial counsel was incorrect when he judged that the Petitioner would be a poor witness because of anxiety. We also note no unusual or irreconcilable inconsistencies in the Petitioner's account.

As to trial counsel's promise that the Petitioner would testify, we agree with the State on appeal that the promise was not a major part of his opening statement. During trial, however, both the trial court and the State relied on that promise in referencing the Petitioner's decision to testify; we agree that trial counsel's failure to call the Petitioner under such circumstances deficiently risked that the jury would hold the broken promise against the Petitioner.

**B. Trial Counsel's Failure to Argue Attempted Voluntary Manslaughter**
We also agree with the post-conviction court that trial counsel was deficient in failing to argue that the Petitioner was at most guilty of attempted voluntary manslaughter. The State correctly notes that attempted voluntary manslaughter was charged to the jury, and that much of the Petitioner's testimony at his post-conviction hearing does not support a conviction for attempted voluntary manslaughter, "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner," Tennessee Code Annotated section 39-13-211, because the Petitioner testified that he shot the victim in self-defense. We believe, however, that this argument ignores the practical reality, explained by Mr. Raybin, that juries often seem to convict sympathetic but culpable [Petitioner]s of lesser-included offenses.

The jury also would not have been required to credit the "self-defense" portion of the Petitioner's testimony; other elements of his testimony were sufficient for a finding of adequate provocation. Most importantly, the evidence does not preponderate against the

-17-

post-conviction court's evident finding that trial counsel had no reason not to argue attempted voluntary manslaughter. Trial counsel could not remember why he had failed to do so. We agree with the post-conviction court that trial counsel was deficient in needlessly failing to argue for a credible lesser-included offense.

## C. Prejudice

Trial counsel's failure to call the Petitioner to testify, standing alone, may not have been prejudicial had there been some intervening reason why the Petitioner's testimony would have been harmful to his defense. We have explained, however, that the record reflects no such reason. In the absence of the Petitioner's testimony, the jury simply lacked anything resembling a full account of the facts and circumstances of this case; it knew very little about the lengthy, tumultuous relationship between the Petitioner and Ms. Felts or the history of competition between the Petitioner and the victim. The jury knew nothing about the Petitioner's motivations or mental state on the morning of May 5. In our view, the post-conviction court correctly held that the lack of the Petitioner's testimony prejudiced him. Further, we agree with its conclusion, based on Mr. Raybin's expert testimony, that trial counsel's broken promise likely led the jury to view the Petitioner in a negative light.

We also agree with the post-conviction court that complete acquittal on a self-defense theory was unlikely given the Petitioner's decision to enter Ms. Felts' house armed with a gun. Under these circumstances, trial counsel's failure to argue attempted voluntary manslaughter tended to lessen the chance that the jury would convict the Petitioner of a lesser-included offense. Again, we can discern no reason for trial counsel's failure to consider or argue attempted voluntary manslaughter.

As in Zimmerman, "it may be that none of these . . . areas of deficient performance, standing alone, would have justified the grant of a new trial. Yet, we think that the cumulative effect of these errors deprived the [Petitioner] of a meaningful defense. The reliability of the verdict is in question." 823 S.W.2d at 228. "A reasonable probability of being found guilty of a lesser charge, or receiving a shorter sentence, satisfies the second prong of Strickland." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing Zimmerman, 823 S.W.2d at 224). We conclude that, had trial counsel promised the Petitioner's testimony, presented that testimony, and argued attempted voluntary manslaughter in closing, there is a reasonable probability that the Petitioner would have been either acquitted or convicted of a lesser-included offense.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the Criminal Court of Sumner County's grant of post-conviction relief. This case is remanded for a new trial.

_____
DAVID H. WELLES, JUDGE